**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DARLENE JONES-JOHNSON,

    Plaintiff,

    v.

JOANNE B. BARNHART, Commissioner of Social Security Administration,

    Defendant.
_____/

No. C 05-4624 PJH

**ORDER REMANDING CASE**

Plaintiff Darlene Jones-Johnson ("Jones-Johnson") seeks judicial review of the Commissioner of Social Security's ("Commissioner") decision denying her claim for disability benefits pursuant to 42 U.S.C. § 405(g). The action is before the court on the parties' cross motions for summary judgment, and Jones-Johnson's alternative motion for remand. Having read the parties' papers and administrative record and having carefully considered their arguments and the relevant legal authority, the court remands this case to the Commissioner for further proceedings in accordance with this order.

**BACKGROUND**

Jones-Johnson applied for Social Security disability insurance benefits on July 25, 2002. Administrative Record ("A.R.") 19, 55. She claimed October 15, 2001 as the onset date of her disability. A.R. 55. The Commissioner denied her initial application and subsequent request for reconsideration. A.R. 31, 34. Jones-Johnson then filed a request for a hearing, which was held before administrative law judge ("ALJ") Robert Wenten on October 26, 2004. A.R. 45. The ALJ rendered a decision on January 26, 2005, denying Jones-Johnson's application. A.R. 19-26. The Appeals Council denied review, and the

ALJ's decision was affirmed on September 7, 2005. A.R. 6. On November 10, 2005, Jones-Johnson filed this appeal.

Jones-Johnson was born on July 19, 1957, and is now 49 years-old. A.R. 19. At the time of the hearing, she was 47 years-old. A.R. 19. She is a resident of Oakland and lives with her adult son, her adult niece, and her minor son. She is a high school graduate and has completed one year of college. A.R. 19. In the past, she has worked as a teacher, an advocate for the homeless, and a bill reviewer. A.R. 76. The only employment which Jones-Johnson has engaged in since the alleged onset date of her disability is caring for her grandson. A.R. 366.

Jones-Johnson has experienced both physical and mental impairments. At the hearing before the ALJ, Jones-Johnson testified that she requires significant help caring for her grandson; she has trouble walking; she needs substantial help with activities of daily living, she has trouble concentrating; and she often gets anxious. A.R. 378-387. Jones-Johnson's niece, Yolanda Logwood, also corroborated her testimony and noted that her appearance and disposition changed dramatically several years ago. A.R. 395-398.

Jones-Johnson's physical difficulties stem from two accidents. The first occurred in May 2001, when Jones-Johnson fell while shopping at a mall. A.R. 157. This fall resulted in an ankle injury that eventually led to surgery to remove an osteophyte[1] from her left ankle. A.R. 207. This surgery, however, did not entirely correct the problem. On March 25, 2002, Jones-Johnson was diagnosed by Dr. Larry Woodcox with post-traumatic synovitis[2] and probable lateral impingement syndrome.[3] A.R. 161. He also diagnosed mild degenerative joint disease of the left ankle, a condition that likely preexisted the accident at

---

[1] An "osteophyte" is "a bony outgrowth or protuberance." Stedman's Online Medical Dictionary, http://www.stedmans.com/section.cfm/45 (last visited Dec. 21, 2006).

[2] "Synovitis" is the "[i]nflammation of a synovial membrane, especially that of a joint. In general, when unqualified, the same as arthritis." *Id.*

[3] A definition for this condition was not available.

1  the mall. A.R. 161. Subsequently, on March 24, 2003, Dr. John Stienstra also diagnosed
2  Jones-Johnson with degenerative joint disease of the left ankle, fitted Jones-Johnson with
3  an arch support, prescribed the drug Relafen, and referred Jones-Johnson to physical
4  therapy. A.R. 176.

5       The second accident which gave rise to Jones-Johnson's physical impairments was
6  an October 10, 2001 car accident. A.R. 223, 370. This accident, which was the immediate
7  precipitant of Jones-Johnson's unemployment and disability claim, appears to have caused
8  a minor back injury  A.R. 370.

9       On July 8, 2003, at the request of the Commissioner, Jones-Johnson was evaluated
10 by Dr. Amit Rajguru who conducted a physical examination to determine Jones-Johnson's
11 ability to work. A.R. 279-282. Dr. Rajguru opined that Jones-Johnson was capable of
12 "lifting or carrying 10 lbs occasionally and frequently" and capable of walking or standing for
13 2 hours in an 8-hour day. A.R. 282. Dr. Rajguru diagnosed Jones-Johnson's ankle
14 condition as arthritis, in contrast to her treating physician, Dr. Stienstra's diagnosis of
15 degenerative joint disease. A.R. 281.

16      Jones-Johnson also suffered from depression and anxiety. She was treated at least
17 nine times by Dr. Alan Scott at the Schuman-Liles Clinic between March 12, 2003 and April
18 7, 2004. A.R. 324-335. On March 12, 2003, Dr. Scott completed admission notes and
19 made several observations and diagnoses. A.R. 324. He described Jones-Johnson's
20 mood as depressed and anxious. A.R. 325. He also noted that her concentration and
21 attention were "generally impaired," which was the most significantly impaired option that
22 Dr. Scott could choose from on the scale he utilized. A.R. 327. Dr. Scott also assessed
23 Jones-Johnson's Global Assessment of Functioning ("GAF") at 50, prescribed Lexapro and
24 Halcion, recommended monthly visits to the clinic, and discontinued her prior use of
25 Prozac.[4] A.R. 328.

---

[4]The Global Assessment of Functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians and doctors to rate the social, occupational and psychological functioning of adults. The scale is presented and described in the DSM-IV. The lower the

3

In conjunction with her application for benefits, Jones-Johnson was also evaluated at the request of the Commissioner by psychologist, Dr. Vicky Campagna. Dr. Campagna assessed Jones-Johnson's GAF score at 70, and opined that Jones-Johnson's attention and concentration were adequate for simple tasks. A.R. 289.

Finally, Jones-Johnson was also evaluated at the Commissioner's request by Dr. T. M. Gragg who completed a Psychiatric Review Technique Form ("PRTF") and a Mental Residual Functional Capacity Assessment ("MRFCA"). A.R. 299-319. The PRTF was completed to determine whether Jones-Johnson suffered from an affective disorder, thereby rendering her disabled. On the PRTF, Dr. Gragg diagnosed Jones-Johnson with depression and described her degree of limitation as "moderate" with respect to activities of daily living and maintaining concentration, persistence, or pace. A.R. 302, 309. With respect to social functioning, Dr. Gragg described her degree of limitation as "marked." A.R. 309.

On the MRFCA, however, Dr. Gragg's painted a more optimistic picture, describing Jones-Johnson as "not limited" with respect to similar categories. A.R. 317-318. Despite the fact that the two forms were completed on the same day, Dr. Gragg gave no explanation for this discrepancy.

## STATUTORY AND REGULATORY FRAMEWORK

The Act provides for the payment of disability insurance benefits to people who have contributed to the Social Security system and who suffer from a physical or mental disability. See 42. U.S.C. § 423(a)(1). To evaluate whether a claimant is disabled within the meaning of the Act, the ALJ is required to use a five-step sequential analysis. 20 C.F.R. § 404.1520. The ALJ may terminate the analysis at any stage where a decision can be made that the claimant is or is not disabled. See Pitzer v. Sullivan, 908 F.2d 502, 504 (9th Cir. 1990).

At Step One, the ALJ determines if the claimant is currently engaged in any

---

number on the GAF, the lower the patient's functioning.

4

"substantial gainful activity," which would automatically preclude the claimant from receiving disability benefits. See § 404.1520(b). If not, at the second step, the ALJ must consider whether the claimant suffers from a severe impairment which "significantly limits [the claimant's] physical or mental ability to do basic work activities." See § 404.1520(c). The third step requires the ALJ to compare the claimant's impairment to a Listing of Impairments in the regulations. See § 404.1520(d). If the claimant's impairment or combination of impairments meets or equals the severity of any medical condition contained in the Listing, the claimant is presumed disabled and is awarded benefits. Id.

If the claimant's condition does not match the Listing, the ALJ must proceed to the fourth step to consider whether the claimant has sufficient "residual functioning capacity" ("RFC") to perform his or her past work despite the limitations caused by the impairment(s). See § 404.1520(e). If the claimant cannot perform his or her past work, at step 5, the Commissioner is required to show that the claimant can perform some other work that exists in significant numbers in the national economy, taking into consideration the claimant's "residual functional capacity, age, education, and past work experience." See § 404.1520(f).

Thus, at steps one through four, a claimant must demonstrate a severe impairment and an inability to engage in his or her previous occupation. See Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); Andrews v. Shalala, 53 F.3d 1035, 1040 (9th Cir. 1995). The burden shifts to the Commissioner only if the analysis proceeds to step five, in which case the Commissioner must demonstrate that the claimant can perform other work. Id.

**ALJ'S FINDINGS**

At Step One, the ALJ determined Jones-Johnson had not engaged in substantial gainful activity since her disability onset date. He reasoned that the child care that Jones-Johnson had engaged in did not constitute "substantial gainful activity," although he noted that it was "certainly an indication of the claimant's ability to perform some work activity." A.R. 20. At Step Two, the ALJ found that Jones-Johnson's debilitating conditions, namely,

residuals from the ankle injury, back injury, and depression, were "severe." A.R. 20, 24. At Step Three, the ALJ found that Jones-Johnson had not established that any of her impairments met or equaled one of the applicable listings. A.R. 25.

At Step Four, the ALJ determined Jones-Johnson's RFC, and concluded that she was not capable of past relevant work. A.R. 25. The ALJ, however, found Jones-Johnson capable of sedentary work activity despite her physical and mental impairments. A.R. 23. In making this determination, the ALJ relied on the evaluations of Drs. Amit Rajguru and LolaLee Van Compernolle, who both found Jones-Johnson capable of sedentary work activity despite her physical condition. A.R. 21, 22. With respect to Jones-Johnson's mental impairments related to her depression and anxiety the ALJ found "some diminution of interpersonal contact ability but no significant impairment of concentration ability." A.R. 23. In making these determinations, the ALJ found Jones-Johnson's testimony "partially credible but not to the extent that she is precluded from all work activity." A.R. 23.

The ALJ also observed that a lay witness testified that Jones-Johnson "drifts off" but noted that the witness could not testify as to whether this was caused by medication or something else. A.R. 23. The ALJ also noted that Dr. Campagna concluded that Jones-Johnson's mental impairments did not preclude her from completing simple tasks. A.R. 23.

After conducting the established sequential analysis, the ALJ determined at Step Five that Jones-Johnson was not disabled because she was capable of work that exists in significant numbers in the national economy. A.R. 25. Specifically, the ALJ found Jones-Johnson capable of working as a Bench Assembly Worker (DOT 706.687-010). A.R. 25. The vocational expert testified that this was a "sedentary" job. A.R. 406. The ALJ also found that this job existed in significant numbers in the national economy. A.R. 25.

## DISCUSSION

### A. Standard of Review

An ALJ's decision can be set aside only if "the ALJ's findings are based on legal error or are not supported by substantial evidence." Tackett v. Apfel, 180 F.3d 1094, 1097

(9th Cir. 1999). Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989). The court is required to review the administrative record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion. Id. Where the evidence is susceptible to more than one rational interpretation, the court must uphold the ALJ's decision. Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

**B.    Issues**

Jones-Johnson's motion raises five issues: (1) whether the ALJ assigned sufficient weight to treating physician, Dr. Scott's opinions; (2) whether the ALJ erred in evaluating the credibility of Jones-Johnson's subjective complaints; (3) whether the ALJ gave appropriate weight to the testimony of lay witnesses; (4) whether the ALJ sufficiently addressed Jones-Johnson's non-exertional limitations; and (5) whether the ALJ considered all of the evidence.

**C.    Analysis**

**1.    Treating Psychiatrist's Opinion**

Jones-Johnson contends that the ALJ improperly dismissed her treating psychiatrist, Dr. Alan Scott's opinion by failing to detail his reasons for its rejection.

Ninth Circuit case law distinguishes between the weight to be accorded to the opinions of different types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians). Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). Generally, controlling weight is given to a treating physician's opinion regarding a claimant's medical disability. Id. If a discrepancy exists between the opinions of the different physicians, the ALJ may discount a treating physician's opinion by setting forth "specific and legitimate reasons" based upon substantial evidence. Id. at 830-31. The ALJ can meet this burden by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

7

thereof, and making findings." Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600-01 (9th Cir. 1999).

It is unclear whether the Commissioner disputes that Scott was Jones-Johnson's *treating* physician. Without much discussion, the Commissioner simply refers to Scott as an "examining" physician, but does not present any argument as to why Scott should not be considered a "treating" physician. Nor did the ALJ address this issue.

A treating physician is one who the claimant has seen with a frequency consistent with accepted medical practice for the type of treatment required for the claimant's medical condition. Id. In other words, the treating physician is the one who has an "ongoing treatment relationship with the claimant." Benton v. Barnhart, 331 F.3d 1030, 1038 (9th Cir. 2003). By contrast, a nontreating physician is one who has examined the claimant but has not established an ongoing treatment relationship. 20 C.F.R. § 404.1502. Additionally, a physician who has treated a claimant only a few times or after long intervals will still be considered a treating physician if the "nature and frequency" of visits is typical for the condition at issue. Id.

Generally, a treating physician's opinion is entitled to greater weight than the opinions of doctors who do not treat the claimant because treating physicians are the professionals "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) . . . ." Id.; § 404.1527(d)(2). The ALJ need not draw a bright line, however, because the doctor-patient relationship is "better viewed as a series of points on a continuum reflecting the duration of the treatment relationship and the frequency and nature of the contact." Benton, 331 F.3d at 1038.

In Benton, the claimant, who brought an action on behalf of his deceased wife, appealed a district court's decision to affirm the denial of his wife's claim for disability insurance benefits. Id. at 1032. At issue in the case was whether § 404.1502, the definitional provision for "treating sources," precluded a supervisory physician from being considered a treating source. Id. at 1036. The court concluded that a supervisory

8

physician can be considered a treating source and ultimately held that the doctor at issue in Benton, Dr. Zwiefach, was a treating physician, albeit "relatively low on the continuum of treating physicians." Id. at 1038-39. In particular, the court noted that although Dr. Zwiefach had only "seen the claimant once, he continued to oversee her care" and he was still employed to cure her. Id. at 1037. In its analysis, the court emphasized that Dr. Zwiefach's report reflected both his opinions as well as those of the medical treatment team under his supervision. Id.

It is clear to the court from both the record before it and from the applicable legal standards that Dr. Scott was indeed a treating physician, treating Jones-Johnson for depression. Here, Jones-Johnson saw Dr. Scott nine times over thirteen months. A.R. 322, 323, 339. During this time, Dr. Scott wrote at least six prescriptions and at several times, altered her treatment. A.R. 322, 323, 328.

Accordingly, to the extent that the ALJ disregarded Dr. Scott's opinions in favor of a conflicting opinion from a non-treating physician, he was required to set forth specific, legitimate reasons for doing so that are based on substantial evidence in the record. See Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983) .

Jones-Johnson argues that there are "partial" inconsistencies between the opinions of Dr. Scott, the treating physician, and that of Dr. Campagna, the diagnosing physician, with respect to the severity of her depression. She notes that Dr. Scott assessed her GAF score as 50 and found her more significantly impaired than Dr. Campagna, who determined that her GAF was 70 and that her depression did not prevent her from performing simple tasks. A.R. 289, 329. The Commissioner, on the other hand, argues that there are no significant inconsistencies.

The ALJ here afforded little if any significance to Dr. Scott's opinion. In fact, the ALJ did not even mention Dr. Scott by name in the decision, but simply referred to the treatment center at which Dr. Scott worked. Additionally, with respect to the GAF scores, the ALJ in this case simply mentioned the two different GAF scores, but never explicitly endorsed or

rejected one or the other of the scores, nor examined the discrepancy in detail.  While there is no Ninth Circuit law directly on point regarding the significance of GAF scores, according to the *Diagnostic & Statistic Manual of Mental Disorders ("DSM IV")*, the 20 point discrepancy in GAF scores constitutes a significant difference of opinion.  A GAF score of 50 indicates "major impairments in several areas, such as work or school, family relations, judgment, thinking or mood;" whereas a score of 70 indicates only "some mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well . . . ."  *DSM IV* at 32.

Given the greater weight accorded to the diagnosis of treating physicians over examining physicians and the fact that there appears to be a distinct inconsistency in treating physician Dr. Scott's opinion regarding the severity of Jones-Johnson's depression, as compared to that of Dr. Campagna, the evaluating physician relied on by the ALJ, the ALJ's failure to mention Dr. Scott's opinion in any detail, let alone provide  "specific and legitimate reasons" based upon substantial evidence for rejecting his opinion requires remand for further consideration and explanation.   See Benton, 331 F.3d at 1038-39.

### 2. The ALJ's Credibility Assessment

Jones-Johnson contends that the ALJ also erred in assessing the credibility of her testimony regarding her mental impairments.

Absent affirmative evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering clear and convincing reasons.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Evidence that can be considered in evaluating a claimant's credibility includes inconsistencies in the claimant's testimony, the extent of the claimant's daily activities, physicians' observations, or any unexplained failure to follow a course of prescribed treatment.  Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991).   Additionally, notwithstanding the Bunnell standard, a lack of objective medical evidence may be a relevant consideration when coupled with the above factors in determining the severity of the claimant's pain.  Rollins v. Massanari, 261 F.3d

853, 857 (9th Cir. 2001). While an ALJ's perception of the claimant at a hearing is not alone a sufficient basis for discrediting that claimant's testimony, a claimant's tendency to exaggerate, compounded by her presentation at the hearing, can be a proper basis for rejection of a claimant's testimony. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001). An ALJ may also properly consider the claimant's work record, reputation for truthfulness, and the inconsistencies of a claimant's testimony, as compared to medical records and other evidence in the record. Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999).

Jones-Johnson argues that the ALJ improperly discredited her testimony regarding her mental impairments and non-exertional limitations, without finding any evidence of malingering. In support, she notes one specific instance in which the ALJ directly disregarded her testimony. Jones-Johnson testified that her inability to care for her grandson without help was based on her mental condition. A.R. 390, 391. The ALJ, on the other hand, directly found that Jones-Johnson's inability to care for her grandson was "apparently a physical limitation, as she cited difficult walking and lifting." A.R. 23.

Overall, in discounting claimant's testimony regarding the effects of her depression, the ALJ relied solely on the limited nature of Jones-Johnson's mental health treatment in contravention of Ninth Circuit law. Nguyen v. Charter, 100 F.3d 1462, 1465 (9th Cir. 1996) (because mental illness so frequently goes untreated, the absence of treatment is not valid grounds for rejecting claimant testimony). Moreover, given Jones-Johnson's treatment record for depression, that characterization of her treatment as "limited" was not based on substantial evidence.

Accordingly, the ALJ's very general finding regarding Jones-Johnson's lack of credibility does not satisfy Ninth Circuit standards. On remand, the ALJ is required to offer "clear and convincing reasons" for rejecting Jones-Johnson's testimony regarding her mental impairments. Reddick, 157 F.3d at 722.

**3.     Lay Witness Testimony**

11

Jones-Johnson also argues that the ALJ improperly dismissed her niece, Yolanda Logwood's testimony. Logwood testified regarding Jones-Johnson's symptoms of depression and loss of ability to concentrate; her need for help with activities of daily living and caring for the grandson; and her changes in mood and behavior. The Commissioner counters that the ALJ did not discount Logwood's testimony, and that even if he had, it is appropriate to discount Logwood's testimony and that he was not required to provide reasons for doing so.

An ALJ may reject lay testimony if he gives reasons germane to the witness. Dodrill v. Shalala, 12 F. 3d 915, 919 (9th Cir. 1993). Although lay witnesses have to rely, at least to some extent, on communications with the claimant to assess the claimant's condition, the Ninth Circuit has held that friends and family in a position to observe a claimant's symptoms and daily activities are competent to testify as to her condition. Id. "Disregard of this evidence violates the Secretary's regulation that he will consider observations by non-medical sources as to how an impairment affects a claimant's ability to work." Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987), citing 20 C.F.R. § 404.1513(e)(2).

In Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996), which expanded on Dodrill, the Ninth Circuit held that "[l]ay testimony as to a claimant's *symptoms* is competent evidence which the Secretary must take into account ... unless he expressly determines to disregard such testimony, in which case 'he must give reasons that are germane to each witness.'" 100 F.3d at 1467 (emphasis in original). In Nguyen, the Secretary, relying on Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984), erroneously argued that it was proper for the ALJ to disregard lay testimony without giving specific reasons for doing so, when the lay witness testimony conflicts with available medical evidence. Nguyen, 100 F.3d at 1467. The Nguyen court carefully limited this rule to situations in which lay witnesses were not making medical diagnoses beyond their competence as witnesses. Id. "[L]ay witness testimony as to the claimant's symptoms or how an impairment affects ability to work *is* competent evidence ... and therefore *cannot* be disregarded without comment."

12

Id., citing Dodrill, 12 F.3d at 919; 20 C.F.R. § 404.1513(e); Sprague, 812 F.2d at 1232 (emphasis in original).

Logwood testified specifically that Jones-Johnson had trouble concentrating when caring for her grandson but Logwood was unsure whether this was the result of the medication she was on. A.R. 393. Logwood also testified that Jones-Johnson needed substantial help with the activities of daily living and that her mood and general appearance had changed suddenly several years ago. A.R. 394-397.

The ALJ found no significant impairment of concentration ability. A.R. 23. To the extent that Logwood testified that Jones-Johnson's concentration ability was impaired, the ALJ discounted this testimony. It is the Commissioner's position that Logwood's testimony does not support a finding of a disabling mental limitation. However, even if Logwood's testimony as to "drifting off" was ambiguous, her testimony as to the drastic change in Jones-Johnson's mood and general appearance lends support to Jones-Johnson's claim of a disabling mental condition. Accordingly, it appears that the ALJ did indeed at least reject Logwood's testimony in part.

The Ninth Circuit required the ALJ to "give reasons that are germane to [Logwood's testimony]" prior to rejecting it. Nguyen, 100 F.3d at 1467. To the extent that the Commissioner argues otherwise, she is incorrect. Here the ALJ acknowledged Logwood's testimony, but failed to specify the weight that he ascribed to it, or whether he was disregarding the testimony in its entirety.

On remand, the ALJ must provide a reasoned discussion explaining what weight, if any, he accords Logwood's testimony or his reasons for disregarding it.

**4.  ALJ's Treatment of Non-exertional Limitations and Grids Reliance at Step Five**

Jones-Johnson also argues that the ALJ erred in assessing her non-exertional limitations, such as the effect of her concentration and interpersonal skills on her overall functioning. She reiterates many of the same arguments already discussed above. To the extent that her arguments are duplicative of those already addressed, the court will not

13

address them again here.

At Step Five, the burden shifts to the Commissioner to demonstrate that there are other jobs that exist in significant numbers in the national economy which the claimant could reasonably perform. 20 C.F.R. § 404.1560(b)(3); Tackett, 180 F.3d at 1100. The Commissioner can meet the burden of demonstrating appropriate jobs in "significant numbers" in one of two ways. The ALJ can either hear the testimony of a vocational expert ("VE") or can refer to the Medical-Vocational Guidelines (commonly known as the "grids") found at 20 C.F.R. pt. 404, subpt. P, app. 2. Id. at 1101.

The grids are "a matrix system for handling claims that involve substantially uniform levels of impairments." Id.; see 20 C.F.R. pt. 404, subpt. P, app 2. The grids provide the Commissioner an efficient means for assessing claims in a uniform and streamlined fashion. Id. The efficiency of the grids justifies the ALJ's use thereof, as opposed to a VE, only when the grids "*completely and accurately* represent a claimant's limitations." Id. (emphasis in original). "In other words, a claimant must be able to perform the *full range* of jobs in a given category, i.e., sedentary work, light work, or medium work." Id. (emphasis in original).

A "non-exertional impairment" is an impairment that limits the claimant's ability to work "without directly affecting his or her strength." Desrosiers v. Secretary of Health and Human Servs., 846 F.2d 573, 579 (9th Cir. 1988) (Pregerson, J., concurring) (internal citations omitted). The Ninth Circuit has recognized that significant non-exertional impairments may render reliance on the grids inappropriate. Id. at 577. Significantly, however, a mere allegation of a non-exertional limitation does not automatically preclude application of the grids, and should not allow a claimant to make an end run around the more efficient grids evaluation. Id. By the same token, however, the Desrosiers court observed that "a non-exertional impairment, if sufficiently severe, may limit the claimant's functional capacity in ways not contemplated by the guidelines." Id. In such a case, the grids are inapplicable. Id. The ALJ should first determine if a claimant's non-exertional

14

limitations significantly limit the range of work permitted by his exertional limitations. Id.

The Ninth Circuit, in Bruton v. Massanari, articulated the appropriate scope of an ALJ's use of the grids. 268 F.3d 824 (9th Cir. 2001). In Bruton, a doctor's medical report stated that the claimant, Bruton, was "prophylactically precluded" from prolonged work at or above the shoulder level. Id. The doctor's medical report suggested that Bruton's shoulder impairments may have amounted to a non-exertional limitation and, "[b]ecause Bruton *may* have that impairment," the court concluded that the Commissioner could not appropriately rely on the grids, and should, instead, rely on the testimony of a VE. Id. (emphasis added).

Here, as the Commissioner notes, the ALJ did all that was required by Ninth Circuit law in considering Jones-Johnson's non-exertional limitiations. In light of the existence of such limitations, the ALJ did not rely solely on the grids, but instead relied on the assistance of a VE. The VE incorporated these limitations in his recommendation regarding what type of jobs Jones-Johnson was capable of performing. Therefore, by obtaining VE testimony and referring to the grids only as a framework for determining potential jobs, the ALJ did not err with respect to his consideration of Jones-Johnson's non-exertional limitations.

### 5. Catch-All Evidentiary Claim

As noted, several of Jones-Johnson's arguments are repetitive. She argues in many different places in her motion papers that the ALJ failed to consider all of the evidence in the record. In addition to the evidence already discussed above, she asserts specifically that the ALJ failed to appropriately consider records from her primary care providers at Kaiser Hospital; one of the state agency physician's psychiatric review technique findings; and very generally, the statements of "other health care providers" and "physicians."

Regardless of the source, an ALJ is required to evaluate every medical opinion he receives. *See* 20 C.F.R. § 404.1427(d). Having reviewed the ALJ's decision and the record, claimant's first and third complaints with respect to this issue are without merit.

15

However, as to her second complaint, the ALJ did rely on one of two conflicting reports issued by state physician, Dr. Gragg, without discussing the other report.[5]  However, Dr. Gragg's MRFCA, which the ALJ did not discuss, is actually *unfavorable* to Jones-Johnson.  Thus, the ALJ's failure to explicitly mention this conflicting report is harmless.  The report that the ALJ did in fact consider and discuss in his decision, Dr. Gragg's PRTF,  was the one most favorable to Jones-Johnson.

Accordingly, Jones-Johnson is not entitled to relief on this claim.

## CONCLUSION

For the foregoing reasons, Jones-Johnson's motion for summary judgment is GRANTED in part and DENIED in part.  Because this court affirms in part the ALJ's decision on issues raised by Jones-Johnson in her motion, the Commissioner's cross-motion for summary judgment is GRANTED in part and DENIED in part.

The case is remanded for the ALJ to: (1) provide "specific and legitimate reasons" for rejecting treating psychiatrist Dr. Scott's opinions; (2) offer "clear and convincing reasons" for rejecting Jones-Johnson's testimony regarding her mental impairments; and (3) to articulate any reasons for rejecting lay witness Logwood's testimony.  See 42 U.S.C. § 405(g), at Sentence Four.  The ALJ shall reconvene the administrative hearing if necessary to enable the ALJ to re-evaluate the above issues.

////

////

////

////

////

---

[5]As noted above, Dr. Gragg competed two forms during the course of his examination. These forms are the Psychiatric Review Technique Form ("PRTF") and the Mental Residual Functional Capacity Assessment ("MRFCA").  On the PRTF, Dr. Gragg found that Jones-Johnson's difficulties in maintaining social functioning constituted a marked limitation.  A.R. 309.  This specific diagnosis was in relation to Jones-Johnson's depression.  On the MRFCA which was not referenced by the ALJ, Dr. Gragg determined that Jones-Johnson's social interaction abilities are not specifically limited.  A.R. 318.

The court, however, DENIES Jones-Johnson's motion with respect to the other issues raised.  Accordingly, the ALJ need not re-examine those issues on remand.

Dated: December 22, 2006

**IT IS SO ORDERED.**

_____
PHYLLIS J. HAMILTON
United States District Judge